**FILED**

**NOVEMBER 20, 2007**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

|  |  |  |
|---|---|---|
| HERBERT ELDEAN, | ) | |
| | ) | **07 C 6582** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| ROGER MITCHELL, LAURENCE | ) | Judge |
| LACAILLADE, ECHELON GROUP, INC., an | ) | |
| Illinois corporation, ECHELON INSURANCE | ) | **JUDGE ANDERSEN** |
| SERVICES, INC., an Illinois corporation, and | ) | **MAGISTRATE JUDGE SCHENKIER** |
| ECHELON PROPERTY AND CASUALTY | ) | Magistrate Judge |
| INSURANCE COMPANY, INC., an Illinois | ) | |
| corporation, | ) | **LI** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES THE PLAINTIFF, HERBERT ELDEAN, by and through his attorneys Elliot S. Wiczer and Bernard Wiczer, and for his Complaint against the Defendants ROGER MITCHELL, LAURENCE LACAILLADE, ECHELON GROUP, INC., ECHELON INSURANCE SERVICES, INC., ECHELON PROPERTY and CASUALTY INSURANCE COMPANY, INC. alleges:

### NATURE OF THE ACTION

This is an action by Herbert Eldean ("Plaintiff") individually, who purchased securities from one or more of the Defendants, pursuant to a scheme concocted by Defendants, who cheated him out of $50,000.00 in cash. The individual Defendants, Roger Mitchell and Laurence Lacaillade, who were directors and officers of the corporate Defendants ("Echelon"), by their representations, acts and omissions, willfully concealed facts and misled Plaintiff into believing that he was investing in an existing insurance business consisting of various affiliated companies. Ultimately, the scheme perpetrated

and facilitated by Defendants resulted in Mr. Eldean being cheated out of his cash investment. By this lawsuit Mr. Eldean seeks compensation equivalent to his lost investment, lost profits and attorneys fees, as well as punitive damages for the scheme willfully perpetrated and facilitated by the Defendants.

## JURISDICTION AND VENUE

1.      Pursuant to 28 U.S.C. §1332(a)(1), this Court has diversity jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the case is between citizens of different states.

2.      Additionally, the Court has jurisdiction pursuant to 28 U.S.C. §1331 because Plaintiff's claim also arises under Rule 10 b-5, 17 C.F.R. §240.

3.      Venue is proper in this District under 28 U.S.C. §1391, because the actions complained of occurred within this District, and the County of Cook, which is within this Division. In addition thereto, the Defendants either work and/or are employed within the District.

## THE PARTIES

4.      Plaintiff, Herbert Eldean ("Eldean"), is an individual residing in Macatawa, Michigan, who is a citizen in the State of Michigan.

5.      Defendants, Roger Mitchell and Laurence Lacaillade, were at all times relevant hereto, residents of a State other than Michigan, and on information and belief, they are residents of the State of Illinois.

6.      The corporate Defendants, Echelon Group, Inc. ("EGI") and Echelon Insurance Services, Inc. ("EIS") are each incorporated under the laws of the State of

Illinois, with their principal places of business at 875 N. Michigan Avenue, Suite 1430, Chicago, Illinois.

7.    Corporate Defendant, Echelon Property and Casualty Insurance Company, Inc. is, on information and belief, an Illinois insurance company, licensed to do business in Illinois and Arizona.

8.    Defendants, Roger Mitchell and Laurence Lacaillade were, at all times relevant to the matters pertaining to this lawsuit, officers and directors of one or more of the corporate Defendants.

## FACTS COMMON TO ALL COUNTS

9.    In or about January, 2004, the Defendants delivered by U.S. Mail to Plaintiff a document titled "Echelon Group Confidential Information Memorandum Proprietary and Confidential Information, May 1, 2003" ("Confidential Memorandum"). A true and correct copy of said document is attached hereto as Exhibit "A".

10.    After January, 2004, one or more of the Defendants, acting in concert, delivered to Plaintiff an undated document titled "Echelon Group, Inc. Shareholders' Agreement" ("Shareholders' Agreement"). Said document is attached here to as Exhibit "B".

11.    On or about August 15, 2005 Defendants forwarded to Plaintiff by U.S. Mail, a document captioned "Subscription Agreements", to be signed by Plaintiff in the form attached hereto as Exhibits "C-1" and "C-2", respectively, subscribing for common shares of "a new Illinois business corporation named Echelon Group, Inc."

12.    The document captioned Exhibit C-1 purports to be a subscription agreement to purchase 25,000 shares of Echelon Group, Inc. $10.00 par value common stock, at a purchase price of $10.00 per share.

13.    The document captioned Exhibit C-2 purports to be a subscription agreement to purchase 3,125 shares of Echelon Group, Inc. common stock, with no par value, at a purchase price of $8.00 per share. Exhibit C.

14.    The document captioned Exhibit C-1 was also executed by Plaintiff on or about August 15, 2005 but bears a date at the end of the document of October 9, 2003. This document captioned Exhibit C-2 was executed by Plaintiff on or about August 15, 2005 and bears no date.

15.    "Echelon Group, Inc. Shareholders' Agreement", attached here as Exhibit B, contains a list of shareholders as an exhibit to that document. Said list of shareholders does not contain the name of Plaintiff.

16.    On or about January 6, 2004 Plaintiff caused to be wire-transferred the sum of $50,000.00 from the Huntington National Bank in Michigan, account titled "Herbert Eldean Trust", to CIB Bank, Rantoul, Illinois for the account of "Echelon Insurance Services". The wire was an interstate transfer of funds from Michigan to Illinois. A copy of the verification of the wire titled transaction detail report verifying the transfer and credit to Echelon Insurance Services is attached hereto as Exhibit D.

17.    No stock certificates, investment certificates or other evidence of ownership or the issuance of securities to Plaintiff were ever delivered to Plaintiff.

18.    Plaintiff has made numerous demands on Defendants to issue proof of his alleged investment and Defendants have ignored all of said demands.

4

## COUNT I – SECURITIES FRAUD

19.     The Plaintiff realleges and incorporates paragraphs 1 through 18 as if set forth as paragraphs 1 through 18 of this Count I.

20.     Defendants, and each of them, caused to be sent, by U.S. mail, and interstate commerce, Exhibits A, B, C-1, C-2 and D-the wire transfer report for the purpose of inducing Plaintiff to forward the sum of $50,000.00 to Defendants.

21.     Plaintiff read and relied upon statements and representation made in said Exhibits.

22.     Said statements were made by Defendants to induce Plaintiff to wire the sum of $50,000.00 to Defendants by making Plaintiff believe he was investing in Defendant corporations.

23.     The Subscription Agreements, the Shareholders' Agreements and the Confidential Memorandum (Exhibits A, B, C-1 and C-2) contain the following representations and statements which are false and which were known to be false by Defendants and each of them at the time of making said representations and statements:

a)     That EGI was authorized by its charter to issue 500,000 to 2,000,000 shares of common stock, no par value, when in fact EGI was only authorized to issue 1,000 Class A, no par value shares. Exhibits C-1 and C-2 do not disclose the fact that two classes of shares were authorized to be issued, each containing different preferences and limitations.

b)     That "Given our current surplus, EPC is authorized to conduct business in the non-admitted market in ten states as well as admitted business in Illinois." Confidential Memorandum, Exhibit A. Exhibit A is dated May 1, 2003. Exhibits C-1 and

C-2 indicate that the insurance company referred to on Exhibit A was not, and could not have been, formed as of May 1, 2003.

c)      The Memorandum falsely states "... Walton asserts it was generating premiums at a rate exceeding $36,000,000.00 annually". The Walton reference is to time periods referred of March, 2001, April, 2001, May, 2001 and June, 2001. The fact is that Walton was dissolved by the Secretary of State on June 2, 2000 and not reinstated.

d)      Exhibit A states "EIS offers GL auto and property underwriters that are extremely qualified and have produced consistently profitable business for their former carriers." No source is given to support this statement. It is a statement alleged as fact without sufficient information to determine if true.

e)      "For their investment, owner of EIS shall acquire shares of EPC at the stated surplus value/share as reported on a GAAP basis." Confidential Memorandum, Exhibit A. The statement provides no reference to the source, amount or method of calculating stated surplus value.

f)      "Walton is a Chicago based managing general underwriter ("MGU") founded in 1997." Exhibit A fails to truthfully state that Walton was involuntarily dissolved on June 1, 2000.

g)      "These figures were generated by Walton Risk Services from July, 2000 through July, 2001. Walton saw noticeable rate increases in the beginning of 2001." Exhibit A fails to state that Walton was dissolved on June 1, 2000.

h)      The flow chart on Page 26 of Exhibit A indicates that Echelon Group, Inc. owns 100% of Echelon Property and Casualty, a "domiciled insurance

company". It does not indicate when or where such company was domiciled or licensed or when it was incorporated and provides no source or method to verify the same.

        i)     Echelon Property and Casualty's balance sheet and income statement for the year ended December 31, 2003 is a false statement of assets and liabilities. Said statement is misleading as it does not explain whether prepared on a "GAAP" basis or insurance company "statutory reporting" basis or provides any source or method to determine the veracity of the statement.

24.     The foregoing statements were false and known to be false by Defendants when made.

25.     References to "Walton" are untrue because during the relevant periods referenced in the financial statements, Walton had no corporate existence since it was dissolved by the Secretary of State.

26.     The Confidential Memorandum (Exhibit A), fails to state the assumptions and facts needed to make the statements therein true. Such facts include the basis of preparation of the financial statements for the year ended December 31, 2003, the source of information, and who prepared the statements.

27.     The Confidential Memorandum, Exhibit A and the Subscription Agreements, Exhibits C-1 and C-2 and the accompanying documents demonstrate a practice and course of dealing in connection with the attempted sale of securities to Plaintiff in total disregard for the truth and willful and wanton statements to appear as fact, all designed to work a fraud or deceit upon the purchaser of securities.

28.     Exhibits A, B, C-1 and C-2 attached hereto were prepared by Defendants and delivered to Plaintiff in an attempt to induce the transfer of money or property

through the interstate sale of unregistered securities by means of untrue statements and omissions of material facts required to make the statements true.

29.     The aforesaid documents were delivered to Plaintiff by Defendants to induce Plaintiff to wire the sum of $50,000.00 into Defendants' bank account.

30.     Defendants circulated statements and the Confidential Memorandum (Exhibit A) and Subscription Agreements (Exhibits C-1 and C-2) knowing and having had reasonable grounds to know that the material representations set forth therein, were false and untrue.

31.     The Confidential Memorandum, Exhibit A fails to disclose that an investment in the Defendant corporations carried with it a high degree of risk of loss. Instead, Exhibit A indicates only positive factors and fails to state anything about any potential risk of loss or the facts needed to otherwise evaluate the proposed investment.

32.     Plaintiff reasonably relied on the written representations contained in Exhibits A, B and C-1 and C-2.

33.     The foregoing statements and representations contained in said documents are false statements of material facts.

34.     The representations, false statements, misstatements and omissions made by Defendants of said material facts were made with knowledge of their falseness in connection with the proposed purchase and attempted sale of securities and were relied upon by Plaintiff at the time of wire transferring said $50,000 to Defendants' bank account.

Plaintiff's reliance was reasonable and proximately caused the Plaintiff's loss.

35.     The foregoing conduct is in violation of 815 ILCS 5/12(F).

36.    The foregoing conduct is in violation of 815 ILCS 5/12(G).

37.    The foregoing conduct is in violation of 815 ILCS 5/12(H).

38.    The foregoing conduct is in violation of Rule 10B-5, 17 C.F.R. §240.10B-5.

39.    The foregoing statements were made by Defendants willfully, wantonly and recklessly amounting to malice.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants, jointly and severally, in the sum of $50,000.00 plus prejudgment interest and costs of suit and in the punitive sum in an amount in excess of $100,000.00.

### COUNT II – LOST PROFITS

40.    The Plaintiff realleges and incorporates paragraphs 1 through 39 as if set forth as paragraphs 1 through 39 of this Count II.

41.    In or about January, 2004, and at or about the time that Defendants requested Plaintiff to wire the sum of $50,000.00 to Defendants, Defendants presented Plaintiff with "Echelon Group, Inc. Shareholders' Agreement" ("Exhibit B") purporting to be an agreement between EGI and EIS and various shareholders "who have signed a signature hereto".

42.    Section 5 of said Shareholders' Agreement contains a shareholder's option to sell (a "put") which grants to EGI shareholders a right to sell, prior to January 1, 2008, a shareholder's shares in EGI to EIS and EIS "is" purportedly obligated to purchase said shares.

43.    Section 5b of said Shareholder Agreement (Exhibit B) contains varying prices to be paid for such shares, providing a "guaranteed return" at the rate of a

multiplier equal to 1.4 to 1.6 times the book value per share up to December 31, 2009 ("prior to January 1, 2010").

44.     This profitable put-option granted to shareholders served to induce Plaintiff to invest in EGI.

45.     In reliance upon the put-option providing a "guaranteed return", Plaintiff wire-transferred the sum of $50,000.00 to Defendants.

46.     Said put-option provided, if exercised, Plaintiff would receive the sum of $75,000.00 for a $50,000.00 investment solely at the option of Plaintiff.

47.     No shares were issued to Plaintiff.

48.     Plaintiff has made numerous demands upon Defendants for the issuance of such shares and Defendants have failed to issue any such shares.

WHEREFORE, Plaintiff prays for judgment against the Defendants, and each of them jointly and severally, in the amount $75,000.00 together with interest and costs of suit.

## COUNT III – COMMON LAW FRAUD

49.     The Plaintiff realleges and incorporates paragraphs 1 through 48 as if set forth as paragraphs 1 through 48 of this Count III.

50.     Defendants made the statements in writing set forth in Paragraphs 1 through 48 hereof.

51.     Said statements were a material inducement to cause Plaintiff to wire transfer the sum of $50,000.00 to Defendants on or about January 4, 2004.

52.     Said statements were false and known to be false to Defendants at the time that said statements were made.

53.    Plaintiff relied upon said false statements. Said statements served as an inducement to cause Plaintiff to wire transfer the sum of $50,000.00 to Defendants.

54.    Defendants failed to issue any shares or other evidence of ownership to Plaintiff in exchange for the $50,000.00 paid by Plaintiff.

55.    Plaintiff is entitled to a return of the $50,000.00 given to Defendants. Plaintiff alleges on information and belief that Defendants have taken Plaintiffs sum of $50,000.00 for their personal benefit.

56.    The conduct of Defendants was a willful and wonton disregard of the truth.

57.    The true facts were known to the Defendants at the time the false statements were made and Defendants willfully withheld the true facts from Plaintiff.

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them, jointly and severally, in the sum of $50,000.00, plus interest and costs and for punitive damages in the sum of $100,000.00.

## COUNT IV – BREACH OF CONTRACT

58.    The Plaintiff realleges and incorporates paragraphs 1 through 57 as if set forth as paragraphs 1 through 57 of this Count IV.

59.    In or about January 20, 2004 Plaintiff delivered to Defendants the sum of $50,000.00 to be applied against the purchase price of various common stocks to be issued by Defendant EGI to Plaintiff.

60.    In or about August, 2005 Defendants tendered to Plaintiff subscription agreements for the purchase of 25,000 shares of $10.00 par value common stock at a

price of $10.00 per share and an additional subscription agreement for the purchase of 3,125 shares of no par value common stock at a price of $8.00 per share.

61.     Plaintiff executed and returned to Defendants each subscription agreement.

62.     Defendants also tendered to Plaintiff, for signature, the Echelon Group, Inc. Shareholders' Agreements. Plaintiff executed and returned said Agreements to Defendants.

63.     No shares of stock or evidence of ownership in either of the corporate Defendants or any of their affiliated entities was ever issued to Plaintiff.

64.     Plaintiff has made numerous demands upon Defendants for the issuance of said shares and Defendants have failed to do so.

65.     On information and belief Plaintiff believes that he has lost the following sums of money by reason of the failure to issue such shares:

    a)     For the 25,000 shares of $10.00 par value common stock the sum of $375,000.00; and

    b)     For 3,125 shares of no par value common stock at a price of $8.00 per share the sum of $37,500.00.

66.     The proximate cause of Plaintiff's loss is the Defendants' breach of contract and failure to issue and deliver said shares by Defendants.

WHEREFORE, Plaintiff prays for judgment against the Defendants, individually and against each of them jointly and severally, in the amount of $412,500.00 together with interest and costs of suit.

Respectfully submitted,

Herbert Eldean


By: ___/s/Elliot S. Wiczer_____
        One of His Attorneys


Bernard Wiczer
ARDC No. 03009726
Elliot S. Wiczer
ARDC No. 06208432
Of Counsel:
Wiczer & Zelmar, LLC
500 Skokie Blvd., Suite 350
Northbrook, IL 60062

13