# ECHELON GROUP, INC.

## SHAREHOLDERS AGREEMENT

This Agreement, made as of the ___ day of ____, 2003 by and between ECHELON GROUP, INC., an Illinois corporation (the "Corporation"); ECHELON INSURANCE SERVICES, INC., an Illinois corporation ("EIS"); and the shareholders listed on Exhibit A hereto who have signed a signature page hereto (each individually a "Shareholder" or collectively the "Shareholders").

### WITNESSETH:

WHEREAS, the Shareholders are the owners of record of all of the issued and outstanding shares of the Corporation as indicated on Exhibit A attached hereto.

WHEREAS, the Shareholders and the Corporation desire that all shares of the Corporation be held by the foregoing Shareholders in order to assure continuity and harmony in management and to promote and maintain corporate stability.

WHEREAS, each Shareholder by signing this Agreement agrees to termination and cancellation of all prior agreements, if any, between the Corporation and its shareholders covering the purchase of a Shareholder's Share Interest (as hereinafter defined) upon the occurrence of an event described in Sections 1 through 4 below.

WHEREAS, EIS by signing this Agreement agrees to purchase shares of the Corporation upon the occurrence of an event described in Section 4 below.

NOW, THEREFORE, for and in consideration of the premises and of the mutual promises herein contained, it is hereby agreed as follows:

**Section 1. Restriction on Lifetime Sale or Disposition of Shares**

A. <u>General</u>. No Shareholder shall sell, assign (by operation of law or otherwise), pledge, or in any manner whatsoever transfer (collectively, "Transfer") any part or all of the shares of the Corporation now or at any time hereafter owned by him or her (the "Share Interest") without first offering to sell such part or all of his or her Share Interest to the other Shareholders and in accordance with the terms and conditions of this Section. Notwithstanding the above restriction, this Section shall not apply to any Transfer to a spouse, child, step-child or parent of the Shareholder (each an "Immediate Family Member") or to a trust for the benefit of the Shareholder or an Immediate Family Member or members, providing that the transferee expressly consents to be subject to the provisions of this Agreement in the manner set forth in Section 11.

B. <u>Notice</u>. Any Shareholder intending or desiring to Transfer any part or all of his or her Share Interest (the "Selling Shareholder") other than to an Immediate Family Member or to a trust as described above, shall first give notice of such intention

536927_7

**EXHIBIT**

**B**

to the other Shareholders and the Corporation. Such notice shall specify the number of shares to be transferred, the intended transferee, the proposed selling price if the intended Transfer is a sale, and a description of the other terms and conditions of the intended Transfer.

  C. **Options to Purchase.** The other Shareholders shall thereupon have an option for sixty (60) days after the receipt by the Shareholders of the notice of Transfer, to purchase the shares described in such notice. The price shall be at the price and under the same terms and conditions as those contained in the offer by the proposed purchaser.

  The Shareholders' option to purchase shall be null and void and shall be treated as not exercised unless they shall collectively be exercised as to all of the shares described in the notice and within the 60-day timeframe.

  D. **Allocation of Shareholders' Options.** As between the Shareholders who exercise their option, each shall have the right to purchase their pro rata number of shares based on the number of shares of the Corporation owned by such Shareholder as compared to the total number of such shares owned by all Shareholders exercising their option. In the event a Shareholder does not exercise his or her option in full, each fully exercising shareholder shall have the option to purchase his or her pro rata number of shares subject to unexercised options. In the event any such options remain unexercised, each fully exercising shareholder, in order of size of shareholdings, shall have the right to purchase any remaining shares as to which options have not been exercised. All shareholdings shall be calculated as of the date of the original notice (or, if no notice is required hereunder, the date of the event giving rise to the option).

  E. **Closing.** If an option is exercised, the sale or sales shall be closed at the office of the Corporation at a time (during its ordinary business hours) fixed by the Selling Shareholder, not less than thirty (30) nor more than forty-five (45) days after the expiration of the options. If such options shall have been exercised in whole or in part by more than one Shareholder, the sales shall be closed simultaneously. At the Closing, the Corporation shall issue to the purchaser new certificates for the shares purchased, which certificates shall bear the reference to this Agreement as set forth in Section 11 hereof.

  F. **Non-Exercise of Options.** Upon termination of the options of the Shareholders, unexercised as to any of the shares described in the Selling Shareholder's notice, the Selling Shareholder may Transfer all of the shares described in such notice substantially as outlined in such notice (but in no event for less than the amount of consideration specified therein). Such Transfer must be carried out within sixty (60) days after the options have terminated. However, as a condition of such Transfer, the purchaser must expressly consent to be subject to the provisions of this Agreement in the manner set forth in Section 11.

2

536927_7

## Section 2. Death of a Shareholder

<u>Options to Purchase</u>. In the event of the death of any Shareholder, his or her shares shall be distributed in accordance with the deceased Shareholder's estate plan, will or by operation of law to the heirs or legatees of the deceased Shareholder, providing the transferee expressly consents to be subject to the provisions of this Agreement in the manner set forth in Section 11.

## Section 3. Bankruptcy, Insolvency, etc., of a Shareholder

A. <u>Options to Purchase</u>. In the event of (i) the dissolution of any Shareholder, (ii) the appointment of a receiver or trustee for any Shareholder, (iii) the filing by a Shareholder of a voluntary petition in bankruptcy or the filing against a Shareholder of an involuntary petition in bankruptcy that is not dismissed within thirty (30) days, (iv) the making by a Shareholder of an assignment for the benefit of creditors, or (v) the effecting by a Shareholder of another act of insolvency, the other Shareholders shall have an option, for a period of sixty (60) days after the receipt by the Corporation and the Shareholders or their representatives of written notice of an event described in (i) through (v) above, to purchase from such Shareholder or his, her or its representative (the "Transferor"), the Share Interest owned by such Shareholder or his or her estate . The price shall be the fair market value of the shares or as determined by the Transferors and the purchasing Shareholders and in accordance with this Agreement.

B. <u>Lapse of Options if Not Fully Exercised</u>. Notwithstanding the foregoing, the Shareholders' options shall be null and void and shall be treated as not exercised unless they shall collectively be exercised as to all of the Transferor's Share Interest. In the event of such lapse, the Transferor's Share Interest may be transferred, subject to the terms of this Agreement, to the shareholders, trustees, receivers or distributees of the Transferor, providing the transferee expressly consents to be subject to the provisions of this Agreement in the manner set forth in Section 11.

## Section 4. Purchase of Shares By EIS

A. In the event that EIS from time to time receives a payment of contingent commission pursuant to the terms of that certain Management Services Agreement between EIS and Echelon Property & Casualty Insurance Company dated _____ __, 2003 (the "Commission"), then EIS shall be required to purchase from the Corporation, and the Corporation shall be required to sell to EIS, shares of the Corporation for an amount equal to fifty percent (50%) of such Commission payment within ten (10) days after receipt of such Commission payment (an "Obligatory Purchase"). At EIS's option, to be exercised in its sole discretion, at the time of any such purchase EIS may also purchase, and upon the exercise of such option the Corporation shall sell to EIS, additional shares of the Corporation for an amount up to the other fifty percent (50%) of the Commission payment (an "Optional Purchase"). The price of the shares to be

3

purchased by EIS pursuant to an Obligatory Purchase or an Optional Purchase shall be equal to the Corporation's book value per share (determined in accordance with Generally Accepted Accounting Procedures and based on an annual audited financial statement) on December 31st of the year immediately preceding the date on which the relevant Commission is determined. Except as provided for in Section 5 of this Agreement, the number of shares that may be purchased by EIS pursuant to this Section 4 shall be limited to a number of shares representing at all times less than fifty percent (50%) of the voting shares of the Corporation outstanding from time to time.

B. Both the Obligatory Purchase and the Optional Purchase described above may be cancelled at the option of the Company in the event the ownership interest of the current owners of EIS plus the ownership interest of the employees of EIS ever falls to less than 80% of the voting shares of EIS.

### Section 5. Shareholders' Option to Sell

A. As of January 1, 2007, each of the Class A Shareholders of the Corporation will have the right, to be exercised in his sole discretion prior to January 1, 2008, to sell his shares to EIS, which will be obligated to purchase such shares (the "Option to Sell"). To the extent that the Class A Shareholders and EIS mutually agree upon a third party buyer to purchase such shares, in whole or in part, for the price as provided in Section 5.B hereof, then EIS will not be required to purchase such shares.

B. The price of the shares to be purchased by EIS pursuant to this Section 5 shall be paid to the selling Class A Shareholders in three installments as follows: (i) prior to January 1, 2008, EIS shall pay the selling Class A Shareholder an amount equal to one point four (1.4) times the book value per share of the common stock of the Corporation as of December 31, 2006 multiplied by thirty-three point three percent (33.3%) of the total number of shares sold, (ii) prior to January 1, 2009, EIS shall pay the selling Class A Shareholder an amount equal to one point five (1.5) times the book value per share of the common stock of the Corporation as of December 31, 2007 multiplied by thirty-three point three percent (33.3%) of the total number of shares sold, and (iii) prior to January 1, 2010, EIS shall pay the selling Class A Shareholder an amount equal to one point six (1.6) times the book value per share of the common stock of the Corporation as of December 31, 2008 multiplied by thirty-three point four percent (33.4%) of the total number of shares sold.

C. The limitation set forth in Section 4.A of this Agreement which provides that EIS shall not acquire pursuant to that Section 4 fifty percent (50%) of the voting shares of the Corporation will in no way restrict EIS from purchasing shares pursuant this Section 5.

D. In the event the Class A Shareholders lawfully exercise their Option to Sell under this Section 5, EIS shall not be required to purchase more than twenty-five percent (25%) of the aggregate number of Class A shares.

### Section 6. Exercise of Options

4

536927_7

All options granted under this Agreement shall be deemed exercised upon receipt of written notice of such exercise by the Corporation, the Selling Shareholder or Transferor, where applicable.

**Section 7. Additional Share: Determination of Purchase Price**

The parties hereto agree that the Corporation shall not sell additional shares of the Corporation to any person after the date of this Agreement, other than pursuant to Section 4 hereof without first offering such additional shares to the Class A Shareholders of the Corporation who became Shareholders upon the initial capitalization of the Corporation (the "Class A Shareholders"), and may only sell such additional shares if (a) the person purchasing shares of the Corporation becomes a party to this Agreement as a "Shareholder," and (b) the purchase price per share of such additional shares as determined by the Board of Directors of the Corporation equals or exceeds (i) the price per share paid by the Class A Shareholders, plus (ii) the net investment income per share of the Corporation earned by the Corporation and its subsidiaries from the Initial Date until the end of the calendar month immediately preceding the date of such purchase.

**Section 8. Dividends.**

A. Subject to the provisions of Section 8.B below, the board of directors of the Corporation may, in its discretion, cause dividends to be declared and paid to the Shareholders on a pro rata basis.

**Section 9. Notice.**

Any notice given hereunder shall be in writing and shall be delivered personally, telecopied or mailed, by registered mail, return receipt requested, to the address set forth in the records of the Corporation for a Shareholder or such Shareholder's legal representative, or to the Corporation's principal place of business for notice to the Corporation.

**Section 10. Legend on Share Certificates**

Each Share certificate of the Corporation subject to this Agreement shall bear a legend substantially similar to the following:

> "Transfer of the shares represented by this certificate is restricted under the terms of a Shareholders Agreement between the Corporation and its shareholders, dated _____, 2003. A copy of the agreement, which also affects other rights of the holder of these shares, is on file at the office of the Corporation."

**Section 11. Consent**

Any consent to be subject to this Agreement as required in Sections 1 through 3 of this Agreement shall be in writing, in the following form, and shall be filed with the

Secretary of the Corporation prior to transfer of ownership of record of any interest in the shares of the Corporation:

> "Consent to Buy/Sell Agreement. In consideration of the transfer to me of an interest in certain shares of the Corporation, I do hereby consent to become a party to and be governed by all the terms of an agreement between the Corporation and its shareholders dated _____, 2003 (the "Agreement"). For purposes of the Agreement, I shall be considered a Shareholder, as defined in the Agreement."

**Section 12. Changes in Share Interest**

In the event that the Corporation is involved in a merger, consolidation, reincorporation or reorganization with another corporation which will own eighty percent (80%) or more of the outstanding voting shares of the Corporation, or to whose business it may succeed, and the shareholders of the Corporation receive fifty percent (50%) or more of the outstanding voting shares of the new or surviving corporation, then the shares so acquired shall stand in the place of the shares of the Corporation now or hereafter owned by any party hereto, and such corporation shall be deemed to be the corporation to which the options herein set forth are granted.

If the Corporation pays a share dividend, or shares subject to this Agreement are exchanged for shares of the Corporation of a different class or for voting trust certificates, then such shares of the same or a different class or such voting trust certificates shall thereupon become subject to the provisions of this Agreement upon the same terms and conditions as the shares originally covered by this Agreement.

If, on the happening of any given event or transaction, the Share Interest of any one or more of the Shareholders would increase such that there would be a change in the proportionate Share Interest among the Shareholders as of the date the last Shareholder became a party to this Agreement, then all other Shareholders shall have the option to purchase additional shares on the happening of such event or transaction so that the Shareholders proportionate Share Interest among the Shareholders remains unchanged after such event or transaction.

**Section 13. Termination or Modification of Agreement**

This Agreement or any of its provisions may at any time be changed, modified or cancelled by the written mutual consent of the owners of record of at least sixty-five percent of the Share Interest owned by all of the then Shareholders.

Notwithstanding any other provisions contained in this Agreement, this Agreement shall terminate upon the happening of any of the following events: the sale, exchange or other disposition (other than by merger, consolidation or reorganization) in one transaction of more than fifty percent (50%) of the outstanding shares of the Corporation; the adoption of a plan of complete liquidation by the Shareholders of the Corporation; the merger, consolidation or reorganization of the Corporation in a transaction in which the Shareholders receive less than fifty-one percent (51%) of the

outstanding voting shares of the new or surviving corporation; the effective date of a public offering of shares of the Corporation pursuant to the filing of a registration statement with the Securities and Exchange Commission under which more than fifty percent (50%) of the Corporation's issued and outstanding shares will be publicly held.

**Section 14. Miscellaneous.**

  A. This Agreement shall be binding upon the parties and their heirs, executors, administrators, legal representatives and assigns, any or all of whom shall execute and deliver all necessary documents required to carry out the terms of this Agreement.

  B. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois without regard to principles of conflict of law.

  C. This Agreement constitutes the complete and exclusive statement of the agreement among the Shareholders. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.

  D. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

  E. This Agreement is binding upon, and insures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

  F. If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent.

  G. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

[SEE FOLLOWING PAGE FOR SIGNATURES]

IN WITNESS WHEREOF, each Shareholder has signed his name hereto and EIS and the Corporation have caused this Agreement to be executed on their behalf by their duly authorized officers on the date first above written.

ECHELON GROUP, INC.

By: Roger A. Mitchell
Its: President

ECHELON INSURANCE SERVICES, INC.

By: Laurence L. Lacaillade
Its: Vice President

_____

8

536927_7

# EXHIBIT A
# SHAREHOLDERS

| Name | Number of Shares |
|---|---|
| Herbert W. Alden, Jr. | 6,250 |
| Stephen A. and Catharine M. Alport | 12,500 |
| Robert Asher Trust | 25,000 |
| Robert C. and Mary Ann Eldred | 7,500 |
| Peter Fasseas | 25,000 |
| Ann Giblin Koonz | 12,500 |
| Gregory D. Glyman | 50,000 |
| Charles C. Haffner, III | 25,000 |
| Sohail M. Hasan and Pamela A. Knox | 12,500 |
| William Wesley Higgins | 25,000 |
| Pamela Knox | 12,500 |
| Peter Lacaillade | 25,000 |
| Richard Landy | 10,000 |
| Edward N. McMillan | 25,000 |
| Robert. W. Morey | 50,000 |
| Frank Moroni | 15,000 |
| Thomas C. Mullens | 12,500 |
| Steven W. Satkamp | 12,500 |
| Stephen Schulson | 25,000 |
| Paul A. Walker | 6,250 |
| Bruce J Zwick | 10,000 |
| **TOTAL:** | 405,000 |